TERMINAL DRILLING & PRODUCTION COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 65842. Filed July 21, 1959.

*Emmett E. Doherty, Esq.*, for the petitioner.
*Jack E. Roberts, Esq.*, and *R. E. Maiden, Jr., Esq.*, for the respondent.

MULRONEY, *Judge:* The respondent determined deficiencies in the income tax of petitioner for the fiscal years ended June 30, 1953, and June 30, 1954, in the respective amounts of $4,464.99 and $21,445.17.

Petitioner was engaged in the oil well drilling business. The question in the case involves its right to deduct drilling expenses paid or incurred upon incompleted wells at the time the taxable periods ended.

FINDINGS OF FACT.

Some of the facts were stipulated and they are found accordingly.

Petitioner is a California corporation organized on November 18, 1952, and it commenced business on January 1, 1953, with its principal place of business in Los Angeles, California. Petitioner filed its tax returns for the fiscal years ended June 30, 1953, and June 30, 1954, with the district director of internal revenue at Los Angeles, California.

Petitioner is engaged in the business of drilling oil wells under contracts with owners or operators and during the periods here involved it drilled about 103 oil wells for various customers, usually completing the drilling in from 30 to 90 days. The contracts usually provided petitioner should advance all costs and expenses of drilling and should be reimbursed by the property owner or operator only upon

completion of the well. A few of the contracts provided for progress payments when portions of the work were completed.

Petitioner's books were kept and its income tax returns were filed on an accrual completed-contract basis of accounting with some inconsistencies in reporting. The stipulation shows petitioner's general method of keeping its books and what was done with respect to three incompleted wells at the end of the two accounting periods.

The procedure for keeping the taxpayer's well cost records was coordinated between the Wilmington field office and the Los Angeles office. Final records were maintained in the latter office. Payrolls were made in the Wilmington field office where checks were distributed to field employees biweekly.

A permanent record designated payroll analysis prepared in the field office was forwarded each month to the Los Angeles office together with carbon copies of all payroll checks. The total payroll was broken down in the payroll analysis by allocation to each well for the period reflected in each payroll analysis.

Materials were ordered in the Wilmington field office and vendor invoices were received in that office. Each invoice was marked as to the well job where the material was used and as to the type of expense involved, such as bits, mud, rental, maintenance and repair, service fees, etc. They were approved by the foreman or supervisor on the rig and also approved by the vice president in charge of field operations.

Following approval in the field office, invoices were sent to the Los Angeles office, where they were accumulated and paid on the 10th of each calendar month. The payroll analysis information was entered in the accounts payable journal, a register of accounts payable. These entries were made once a month because the payroll anaylsis was sent to the Los Angeles office once a month.

Approved invoices were entered in the accounts payable journal once a month as to vendor supplier and amount of each invoice. A record of all accounts payable was kept in the accounts payable journal, together with a record of payroll analysis and approved invoices broken down as to wells.

Accounts payable journal also discloses on the last page of each month the total drilling expenses incurred to date on each well on which any drilling work was done during the month. These subtotals for each well were then combined into two separate totals representing (1) wells completed during the month, and (2) work-in-progress. These totals were entered in detail to the appropriate expense accounts and to work-in-progress in total respectively in the general ledger.

As of the following day, i.e., the first day of the following month, the work-in-progress entry is reversed in the work-in-progress account

in the general ledger. The reversal is made in the accounts payable journal crediting work-in-progress and reestablishing to wells the expenses which went to make up the total costs of work-in-progress. In theory and in practice the work-in-progress account in the general ledger is only used on the last day of each month. Work-in-progress is a debit account.

At the completion and upon acceptance of a well by the customer the contract price of the completed well was credited to sales and charged to accounts receivable. Drilling costs were consistently entered in detail to the appropriate expense accounts at the same time related income was entered to "sales" with the exception of those which were charged to expenses on June 30, 1953, and June 30, 1954, incurred in the drilling of wells known as Seaboard 41–10, U.P. 627, and Tomberlin #1.

The taxpayer's records indicate that four wells were incompleted on June 30, 1953, to which accounts the following amounts of costs had been charged:

| | |
|---|---:|
| U.P. 588 | $4,301.12 |
| U.P. 598 | 16,556.97 |
| Dryden #1 | 981.94 |
| Seaboard Gov. 41–10 | [1] 14,494.61 |
| | 36,204.64 |

[1] This figure appears in the stipulation but there is evidently some mathematical error and in respondent's adjustment this figure is $14,454.61. Also the total above is incorrect.

On June 30, 1953, none of the wells listed above was completed or billed. The costs allocated to the Seaboard 41–10 well account were charged to expense accounts on June 30, 1953. The work-in-progress account reflected a total of $21,840.03 comprised of the costs to that date of U.P. 588, U.P. 598, and Dryden #1.

The amount which had originally been charged to the work-in-progress account as of June 30, 1953, on the books of the taxpayer was erased and the figure of $21,840.03 was inserted.

The taxpayer's records indicate that on June 30, 1954, seven wells were incompleted to which well accounts the following amounts of costs had been charged:

| | |
|---|---:|
| U.P. 619 | $9,176.87 |
| Vander Loan | 8,950.44 |
| U.P. 628 | 7,581.40 |
| U.P. 626 | 80.00 |
| Tidewater V L & W 84 | 3,412.09 |
| Tomberlin #1 | 61,265.14 |
| U.P. 627 | 22,281.83 |
| | 112,747.77 |

On June 30, 1954, none of the wells listed above was completed or billed. The costs allocated to the Tomberlin #1 and the U.P. 627 were charged to the expense accounts on June 30, 1954. The work-in-progress account reflected a total of $29,120.05 (including a credit balance of $80.75 in a miscellaneous account called "Shallow Wells") comprised of the cost to that date of U.P. 619, Vander Loan, U.P. 628, U.P. 626, and Tidewater V L & W 84.

The taxpayer had received prior to June 30, 1954, $29,680 as an interim payment for the well known as Tomberlin #1, although the well was not yet completed. This amount was credited to sales on the books of the taxpayer.

The costs charged to each of the three remaining well accounts comprising the work-in-progress balance on June 30, 1953, and to each of the five remaining well accounts comprising the work-in-progress balance on June 30, 1954, were charged to the proper expense accounts in the month in which each well was completed and billed and the contract price credited to sales.

The additional costs incurred during the fiscal year ended June 30, 1954, in completing the well known as Seaboard Government 41–10 were charged to the proper expense accounts at the close of the month in which the well was completed and the contract price credited to sales.

The drilling of Seaboard 41–10 and U.P. 627 was under contracts providing for payments only upon completion. The drilling of Tomberlin #1 was under a contract providing for progress payments on a footage rate basis. Drilling operations commenced on the Tomberlin well on May 11, 1954, and the well was completed in July 1954. The contract provided for payments for portions of the work performed and within 10 days after completion of each portion. The first payment under what is called Footage Rate A in the contract would be due within 10 days after the well had been drilled to a depth of 3,500 feet and the payment was at the rate of $8.48 per foot. The second payment, under Footage Rate B, would be due after the well had been drilled to a depth of 7,500 feet, and the payment was at the rate of $16.40 per foot between the depths of 3,500 and 7,500 feet. The contract also called for other payments after the completion of other work provided in the contract.

Between the date when drilling operations were commenced on the Tomberlin well and June 30, 1954, progressive payments were made to petitioner in the total amount of $29,680, which sum was reported as income by petitioner for the taxable year ended June 30, 1954.

In its income tax return for the year ended June 30, 1953, taxpayer deducted drilling costs for Seaboard 41–10, in the amount of $14,454.61 which had been paid or incurred up to that date. In re-

porting its income for the year ended June 30, 1954, taxpayer deducted drilling costs for Tomberlin #1 and U.P. 627 in the amounts of $61,265.14 and $22,281.83, respectively, which had been paid or incurred up to that date.

Respondent disallowed the above deductions explaining that "following the method of accounting regularly employed by" petitioner, the said deductions were "not allowable within the purview of Section 41 of the Internal Revenue Code of 1939." Respondent's adjustment which disallowed the $14,454.61 (drilling costs for Seaboard 41-10 up to June 30, 1953) also allowed the said sum as deductible in the year ended June 30, 1954, and the adjustment further deferred the progress payment of $29,680 under the Tomberlin contract which petitioner had received and reported as income in the year ended June 30, 1954, to income for the next year when the Tomberlin contract was completed.

#### OPINION.

The questions in this case involve the right of petitioner to deduct drilling expenses paid or incurred upon incompleted wells at the time its first and second taxable periods ended.

Petitioner, on January 1, 1953, commenced its business of drilling oil wells under contracts which were completed in 30 to 90 days. A few contracts provided for progress payments when portions of the drilling work were completed and the others provided for payment of the contract price only upon completion and acceptance of the well. Petitioner's taxable years ended on June 30. For convenience we will sometimes refer to the first two accounting periods here involved (periods ended June 30, 1953, and June 30, 1954) as 1953 and 1954.

During the period from January 1, 1953, when petitioner commenced business, and June 30, 1954, petitioner drilled 103 oil wells for various customers. Petitioner had four wells incompleted at the end of its first accounting period, or June 30, 1953. Its books showed the drilling expenses paid or incurred up to the date for each incompleted well. In its income tax return for 1953 it took a deduction for the drilling expense of one well, Seaboard 41-10, in the sum of $14,454.61, and deferred the drilling costs paid or incurred up to that date of the other three incompleted wells, to the date of completion in the subsequent year. The next year, or 1954, petitioner took a deduction for the balance of the drilling costs incurred in 1954 in completing Seaboard and all of the drilling costs incurred in 1953 and 1954 with respect to the other three incompleted wells on June 30, 1953. The Seaboard well was drilled under a contract providing for payment of the contract price upon completion and acceptance of the well.

On June 30, 1954, the end of petitioner's second accounting period, it had seven incompleted wells. Its books showed the drilling expenses paid or incurred up to that date for each incompleted well. In its income tax return for 1954 it took a deduction for the drilling expenses of two incompleted wells, Tomberlin #1 in the sum of $61,265.14 and U.P. 627 in the sum of $22,281.83, and deferred the drilling costs of the other five incompleted wells, to the date of completion in the subsequent year. U.P. 627 was drilled under a contract providing for payment of the contract price upon completion and acceptance of the well. Tomberlin #1 was drilled under a contract providing for progress payments and petitioner had received progress payments on Tomberlin prior to June 30, 1954, in the total sum of $29,680, which sum was reported as income by petitioner in its income tax return for the period ended June 30, 1954.

Petitioner admits its method of computing income by deducting drilling expenses as to some incompleted wells at the end of an accounting period and deferring to the next year as to others was inconsistent. But petitioner argues the correct adjustment was to place the drilling costs as to all incompleted wells in the years they were paid or incurred.

Respondent's adjustment disallowed the deduction for the drilling costs of Seaboard 41–10 in the sum of $14,454.61 taken by petitioner in its 1953 return but respondent allowed this sum as a deduction in 1954 when the Seaboard contract was completed. Respondent's adjustment for the year 1954 disallowed the deductions for the drilling costs of Tomberlin #1 in the sum of $61,265.14 and U.P. 627 in the sum of $22,281.83, taken by petitioner in its 1954 return, saying these costs (like the costs in Seaboard) are to be deferred until the next year when Tomberlin and U.P. 627 wells were completed. Respondent's adjustment as to 1954 also excluded the progress payment under Tomberlin of $29,680 from petitioner's income for that year, saying that this item (which petitioner had received and reported as income) was to be deferred to the next year's income when the Tomberlin well was completed.

It will be noted the adjustments above conform to a completed-contract system whereby costs incurred and payments received upon incompleted contracts at the end of an accounting period are deferred to the next year when the contracts are completed. Respondent argues that such a system of accounting and reporting of income is the "only" system that will clearly reflect income and, in any event, it was the accounting method adopted by petitioner; that its deductions of drilling costs as to the aforementioned three wells, in the years those costs were paid or incurred, before the years of completion, constituted "deviations" from petitioner's chosen method of accounting. Respondent's adjustments are explained in the notice of deficiency as being

based upon his determination whereby "[i]t is held that, following the method of accounting regularly employed by you, the amount * * * [which petitioner charged to cost of sales, as to the three incompleted wells in controversy, at the end of 1953 and 1954] is not allowable within the purview of Section 41 of the Internal Revenue Code of 1939."

The cited statute provides in part that "net income shall be computed * * * in accordance with the method of accounting regularly employed in keeping the books of such taxpayer."

Respondent's adjustments amount to a determination that the method of accounting regularly employed by petitioner in keeping its books was a method whereby drilling costs were not entered as expenses until completion of the well when the related income from the well was entered to sales—in short, a completed-contract method of accounting. Not much is said in petitioner's brief about its method of accounting regularly employed being other than a completed-contract method. Petitioner argues its method of accounting is sufficient to enable one to determine at all times the drilling costs of incompleted wells and the "correct" method of computing income under the law and regulations is to deduct drilling expenses of all completed and incompleted wells from gross income during the year in which such drilling costs were paid or incurred.

It is not enough that petitioner's method of accounting, regularly employed, would be sufficient to allow computation of net income in a way petitioner sees as the correct way under the statutes and regulations. A taxpayer must first compute his net income "in accordance with the method of accounting regularly employed in keeping [his] books." Sec. 41, *supra*. If, in the opinion of the Commissioner, that method does not clearly reflect income, then the computation can be made in accordance with another method. Thus the question comes down to whether or not petitioner's method of accounting regularly employed in keeping its books was a completed-contract method. If it was, then respondent's determinations are correct, for it is clear that, as to the three wells in question, petitioner expensed the drilling costs before the wells were completed.

We hold respondent was correct in his determination that the method of accounting regularly employed by petitioner was a completed-contract method. Actually the works progress account, wherein was recorded the drilling costs as to each incompleted well, was treated as a sort of inventory account. At the end of each month a profit and loss statement was made and in this statement the amount of the works-in-progress account was carried as an asset. When a well would be completed the drilling costs of the well would be taken out of the works-in-progress account and entered as expenses. This

was the method followed each month. It was the method followed at the end of June 1953 as to three of the four incompleted wells on that date. It was the method followed at the end of June 1954 as to five of the seven incompleted wells on that date. Clearly this was the completed-contract method of accounting where costs are deferred to the date of completion. The three instances when petitioner expensed drilling costs before completion of the well are clear deviations from the method of accounting regularly employed by petitioner.

The instant case is much like *Jones* v. *Smith*, (C.A. 10, 1952) 193 F. 2d 381, reversing United States District Court (W.D. Okla.). There the taxpayers were partners, engaged in the business of drilling oil wells for others under contracts providing for payment upon completion of the contract, usually not over 4 months from commencement of drilling. There the partnership kept its books and filed its information tax returns on the completed-contract basis and the taxpayers argued that such method is accepted accounting practice among those engaged in the business of drilling oil wells for others. The opinion points out the Commissioner did not challenge the general accounting practice of the taxpayers but did contend expenses for drilling a hole that was abandoned because of a cave-in before the end of the tax year had to be deferred until the next year when, with the drilling of a new hole, the contract was completed. The opinion upholds the Commissioner on the ground that treating the expenses of drilling the hole that was abandoned in the year incurred would be a "departure from the accounting practice of the partnership on which its information returns were prepared and submitted." The opinion recognizes that "[t]he method of keeping the books and records of the partnership was a slight modification of the strict accrual method. It was substantially the long-term contract method as applied to a completed contract basis."

It is true that in the *Jones* case the asserted deviations were from the taxpayer's method of accounting and long-continued method of reporting income and here there was no history of reporting income prior to the years in question. But in the *Jones* case as here the Commissioner accepted the completed-contract method of accounting as an adequate reflection of income and his adjustment compelled adherence to the completed-contract method regularly employed.

Our holding here is not inconsistent with *Rowan Drilling Co.*, 44 B.T.A. 189, affd. *Commissioner* v. *Rowan Drilling Co.*, 130 F. 2d 62, cited by petitioner. There an oil and gas well drilling company took deductions for its drilling expenses on incompleted wells in the years paid or incurred. Since this was in accordance with its method of accounting regularly employed and the way it had filed its tax returns, we upheld the taxpayer, as against the respondent's contention that

such drilling expenses should be deferred to the year of completion. This portion of our holding in the *Rowan* case was not involved in the appeal.

The *Jones* and *Rowan* cases illustrate what was well said in *Advertisers Exchange, Inc.*, 25 T.C. 1086, 1092: "Consistency is the key and is required regardless of the method or system of accounting used."

In upholding respondent's adjustments, deferring drilling costs on incompleted wells to the year of completion, we do not decide the controversy as to the *right* way to expense such costs, or the *correct* method of accounting that a short-term contractor should employ. We suspect that either a completed-contract method or a method that expensed all such costs when paid or incurred, would, if consistently followed for a number of years, accurately reflect income. We note respondent has a regulation (Regs. 118, sec. 39.42–4) that permits a long-term contractor, defined as one who performs contracts of more than a year's duration, to report on a completed-contract basis. One of the arguments respondent makes in the instant case is, in effect, that the completed-contract method of accounting is the "only" method that an oil well driller such as petitioner could employ that would accurately reflect income. We need not decide this any more than we need to decide whether petitioner is right when he says the other method is "correct." It is enough that the statute provides for income computation according to the bookkeeping method regularly employed. All that we need hold is that respondent can accept that method that is regularly employed and base his determinations of deficiencies upon deviations from it.

A word should be said about the progress payment for Tomberlin received and reported as income by petitioner in 1954. Respondent's adjustment excluded this from petitioner's 1954 income and explains that this is deferred to the next year when the Tomberlin well was completed. Petitioner makes a general argument that the method of computing income for tax purposes on Tomberlin was correct. Under petitioner's method of accounting it does not appear that it included expensing any drilling costs under contracts calling for progress payments, before completion. The record shows that petitioner drilled but few wells under contracts calling for progress payments. Petitioner does not specifically argue the adjustment that deferred the progress payment to the subsequent year should be set aside—at least not if it be held the drilling expenses are to be deferred to that subsequent year. The deferral of income is a balancing adjustment when the related costs are being deferred. We uphold the Commissioner.

*Decision will be entered for the respondent.*